Good morning, your honors. May it please the court. Mr. Gill appeals from his conviction for possession of a firearm and ammunition. Crucial evidence admitted against Mr. Gill was the testimony of a New York City police detective testifying as a ballistics expert that a shell casing found in the street was fired from a particular gun to a reasonable degree of certainty within the field of ballistics. This was admitted over defense objections without a Daubert hearing and based on the fact that this kind of evidence had been admitted for many years despite two recent National Academy of Science reports questioning the underlying validity of individual firearm identification. The rulings we appeal are the court's refusal to hold a Daubert hearing and the court's allowing the expert's finding to be admitted to any reasonable degree of certainty. May I just ask you what would have happened at the Daubert hearing that was not before the district court already? There's lengthy letter memos from both sides about the issues, the Daubert issues, the Williams issue, everything else. There's the proffer by the government. What more would have happened at the Daubert hearing that the district court didn't have in front of them? Well, the expert would have had to testify to the basis, the actual specific basis for his opinion. There's a summary of that, right? An extensive summary of it. He wasn't cross-examined about it. He didn't have to justify it. When he testified at trial, he was barely able to identify anything. He said that the pictures didn't show what he really saw. He would have been grilled on that in the hearing and maybe Judge Codall would have seen that he couldn't really explain this or he would have had to do a better job and have better photos and bring in more from the lab to explain to the jury how he came up with this. But he was cross-examined about that. He was cross-examined about it. He was cross-examined about one of the reports too, right? He was cross-examined about it, but he basically denied that the report did what it did. He said more than once, I believe, that this was really an imaging report. He kept referring to the 2008 report, the original report on ballistics imaging, and really denied that this had any relevance to what he was doing, either report. But during the cross-examination of this man, he kind of got chopped up. The defense counsel, I thought, did a pretty good job of working him over. Well, he did what he could, Your Honor. He did what he could, but the jury still got that ballistics expert testified 320 times, a real expert in his field, is certain, reasonably certain, that this was a match. Let me ask you this. Was your objection to the testimony, not yours, but I'm sorry, was trial counsel's objection to the testimony renewed after Judge Codall's ruling? It was not renewed, Your Honor, but I think they really had no basis to think that there would ever be any change. This was admitted based on, without a hearing, you know, actually hearing from the expert, but based on the fact that he testified 320 times, and that this . . . That wasn't all. I mean, Judge Codall's decision does offer an explanation of how the proffered expert opinion derived from ballistics technique, the standardized principles, the methods. I understand your argument that if you'd had a hearing, you would have been able to test some of these, but my point to you is, I don't see Judge Codall's opinion, or ruling, let me correct that, as based only on the number of times he had testified, or even the frequency with which ballistics evidence had been admitted. No, Your Honor, I wasn't actually finished with what I was saying. It was based on the number of times, the fact that this kind of evidence has been considered reliable for many, many years, and has been admitted, and based on the ballistics field's science and validation studies. But the point is that the NIS reports, both of them, and now again the PCAST report, call into question, as science . . . You talk about the fact that subjective rather than objective methods are used, but at one point they say, that's by comparison to something like DNA analysis, and one of the reports itself says that a matter need not be as objective as DNA analysis in order to provide value, and what the district court noted was that the false positive rate for ballistics examinations was in the range of 1 percent. So when we take that all together, how do we say that the court abused its discretion? Okay. I'd like to just quote from the NIS report. They do say that it has value, particularly when they're talking about class characteristics. The NIS report does not say class characteristics, which is a very different thing than individual characteristics. They say, the committee agrees that class characteristics are helpful in narrowing the pool of tools that may have left a distinctive mark. That would be the kind of testimony that says, this came from this type of gun, so it's consistent with . . . However, it goes on, individual patterns from manufacture or from where might, in some cases, be distinctive enough to suggest one particular source, but additional studies should be performed to make the process of individualization more precise and repeatable. So distinctive enough to suggest, in some cases, is not even remotely close to, within a reasonable certainty, a match can be made. And that's what we're complaining about. We're not saying that this couldn't have been admitted for what it is, but it was admitted for something much more than what it really is. Now that we know, based on science, that despite years of everyone considering, from the public to the courts, this kind of matchmaking to be reliable, it's not. It hasn't been established to be reliable. But you would have been happy with if it had been permitted to say, more likely than not. Well, that was what was asked for. I think that maybe that even goes too far, but . . . Well, that would be a much less certain standard for the jury to consider. It would. It would. It would have been . . . I mean, if we had gotten that, that would have been a lot better, and then there could have been probing on what that means also. Why wasn't this error harmless? The error wasn't harmless because it was basically the linchpin of the government's case. Well, there's a lot of . . . the government deduced a fair amount of evidence associating this man with the shooting. Well, Your Honor, it's a complicated case, but there was basically no evidence without this . . . the government's theory was . . . he was not charged with the robberies. So the robberies were not the crimes of conviction. He was only charged with possessing the gun and possessing the ammunition. There was no evidence connecting him to the gun in the stairwell of his building with 62 units, in a public stairwell in the basement. There was no evidence connecting him to that without the ballistics evidence. And that was the government's principal theory at trial. It was that he possessed the gun. It's true that they argued strictly as a fallback in one paragraph in their summation referred to the fact that . . . well, you can also always convict him of the shell casing, but their principal theory was that he possessed that gun. And that's at 136 to 40 and 150 to 56 of our appendix. You can see in the summation what their principal theory . . . What about the cell phone? Was his cell phone found at the second robbery where the gun . . . where the shot was found? Right. But without the . . . exactly. It was. Without . . . on that robbery, the victim was unable to identify him in three different procedures. One . . . But the cell phone was found right near the casing, right? The cell phone was found in the area of the casing. It didn't say . . . it never said how close. Somewhere in the area. That was it. That's what they had to connect him to that robbery, to that particular robbery. So even proving his guilt of possessing the shell casing required the ballistics. It was really the ballistics evidence tying that shell casing together with the cell phone to the gun found in his building. Was the shell casing found at the scene a match to some of the shell casings found in the gun that was retrieved from the apartment building? It was the same . . . I believe it was the same kind of shell casing. Yeah. Yeah. No, I don't . . . When all of these start to become, you know, factors that link him closer and closer to it, I'm not sure why it isn't a case where there's other evidence as well. Not enough by itself. I'm not asking you that question. But when you put it together with the shell casing, there's no question about reliability. It's reliable often enough to let the jury hear it. You have to persuade us that the judge abused his discretion in admitting this evidence. That's the standard. Well, it's not . . . we're not contesting . . . we're not contending that he should never have admitted it at all. It's just that he admitted it under the wrong standard. What he allowed . . . there is a gatekeeping and screening function that the judge is supposed to do with expert testimony. It's not just up to the jury to figure it out during cross . . . But that gatekeeping does not require a hearing in every case. And, you know, so you've argued to us that you would have elicited some of the weaknesses before the judge that you elicited at trial. But I'm not sure that you've shown that that would have meant that it would have had to have been kept out. Am I missing something? Well, perhaps it would have been kept out. But what I'm arguing is that given the Williams rationale, Williams . . . the government relies on Williams because Williams did affirm the admission without a Daubert hearing. But two things about Williams . . . two salient things. One, it was . . . it predated the NAS reports. So there was not the, you know, body of scientific opinion challenging the underlying reliability of this. But that's how those reports say it shouldn't be admitted. They suggest what the concerns are with it, but they don't say it shouldn't be admitted. But all of those concerns are concerns that would be addressed in a Daubert hearing. Right. But how did they keep it out? Well, in this case, it might have been kept out had the expert actually been forced before a judge to reveal his, you know, his bases and hadn't been able to. I mean, he was not really able to at trial. When you say it might have been, I think you've stated in response to a question that there was no renewed application to strike the testimony in light of what cross-examination had brought. So how do we guess that the judge would have kept it out? Well, we don't need to guess, because the other prong is that it should not have been admitted at all under the standard that the expert was allowed to testify to. Okay. And that's really our main argument. And had there been a Daubert hearing also, you know, that standard may not . . . probably would not have been allowed. And that shouldn't have been allowed anyway, just based on the science that was before the Court. Thank you. I know you want to reserve some time, so let's hear from the Court. Thanks. Thank you. May it please the Court? My name is Patrick Egan, and I represent the United States in this appeal, and I represented the United States in the case below. The trial . . . remind me of the dates of the trial. The trial dates were July 31st through August 4th . . . Of 2000 and . . . . . . of 2015. Judge Codall did not abuse his discretion, either in the admission of this testimony, which I understand appellant is not challenging currently, or in using the standard within a reasonable degree of certainty in the field of ballistics. Nor did he abuse his discretion in . . . What standard did the government argue for? The government was asked what the standard that the witness would provide, and he said, within a reasonable degree of scientific certainty. And the government believed that, as that was how the witness himself was phrasing his own level of certainty, that that was the appropriate level of certainty. Well, why . . . why is the government pushing that standard in light of the I don't get that. It casts serious doubt on whether this type of testing was sufficiently scientifically reliable. And the government had the report. It's a government report by very distinguished agencies. So why is the government doing this? Your Honor, the government wasn't . . . I don't know that the government was sure what the appropriate level of certainty was, and they did that. The government knew that a prestigious government agency that looks into these matters had raised serious doubts about this test. So why . . . why is the government, in effect, contradicting this information? Well, Your Honor, as I said, what the government was doing was reporting back. Judge Kotel made it very clear that he was going to go with a reasonable degree of certainty in the field of . . . And I thought he said he did that because that was the standard that . . . that was the charge that was given when an element of subjectivity was involved in an analysis. Did I misunderstand that? No. He found support in the case law. That is certainly a . . . That's the charge with medical experts, all of whom bring a certain amount of subjectivity to their expertise. Exactly right. He was looking for something that took away the scientific element. It was clear that Judge Kotel found that he was troubled by the scientific element, so he wanted a reasonable degree of certainty in the field of ballistics. I don't think you meant to say the scientific element, the objective or measurable, quantifiable element. I just meant the use of the term science. And . . . But he also felt that the term was simply inaccurate. He was aware of the opinion in the United States v. Glenn that had used the more likely than not, but he noted that other judges had rejected that. And he asked defense counsel to produce any study that had suggested that error rates were anywhere approaching 49 percent or 50 percent or something that would make more likely than not an accurate standard. And they were unable to. And in their reply brief, they even studied the PCAST report, which cited the discrepancy between what the sort of independent analysis had found in sort of false positives versus what had been found in law enforcement studies. And the discrepancy was large, undeniably. But notably, the discrepancy when it came to independent bodies was 1 in 66, which is about a 1.5 percent error rate, which is right around the error rate that the judge was considering when he decided to allow the testimony and allow it with that standard. Also a reasonable degree of certainty within the field of ballistics. The judge appropriately looked to not generally the field, but also the witness who would be testifying. It is one thing in some of the cases in other districts that have had problems with the level of certainty or have decided not to allow someone to participate. So, we have a case where the judge is a person with far less experience, experts who didn't have proficiency testing. Here was someone who describes the method they used and described that they needed to pass a proficiency test every year, which they had passed, and a proficiency test where in effect, if you get one wrong, you fail and you are sent for retraining. So, this is someone who describes the methodology he used and was able to get the right results. So, What was the government's evidence in addition to the — put aside the shell matching for a minute. What do you think the government proved at trial? Well, the government proved, to the Court's point, in terms of the other evidence, there was, with respect to just the shell casing, in addition to it being found next to a cell phone that had texts from the defendant wherein he responded to someone asking for his information and he gave his name, his address, and I believe his social security number, saying this is my name, this is where I live, and this is who I am. It had pictures of him. So, when they pulled up photos of the person with that information, it had pictures on the phone that matched that person. But in addition, and something that has not been mentioned, this defendant confessed to participating in this robbery and not just participating in it, he confessed to both dropping his cell phone at the scene and to firing off a shot. He put the cell phone next to the shell casing and demonstrated that this shell casing, without the benefit of any of the ballistics evidence, was a shell casing that he possessed. The government, and that is why the government, in addition to its arguments with respect to abuse of discretion, which, again, the government does not believe that Judge Codal abused his discretion in employing the standard or doing so without a hearing, but to the extent there was any error, it was harmless because there was this shell casing evidence. And indeed, to even get to the ballistics evidence, for the jury to even consider the ballistics evidence, they need to have concluded that this defendant possessed this shell casing. The match of the two is what makes the ballistics evidence relevant, that this shell casing matches this gun. They have to accept as a premise to find him guilty of the gun that that shell casing was something he possessed. And there was more than ample evidence that that shell casing was what he possessed, both from his detailed confession and later from the one on video where he said, these crimes, I committed them. With respect to the hearing ---- I think there was a, there were videos taken for stationary cameras, right? Those were, there was video coverage within the building. And on the day of the second robbery, the one where the shell casing, it shows him leaving the building shortly before the robbery. And it shows him returning, it shows him returning, or I should say what appears to be him. He comes in through a different entrance and someone wearing his clothes comes up a staircase and you just get a glimpse. But when he leaves, he leaves out the front door. There is also evidence on the day that the gun was found of him going to the spot where the gun was, which was under a stairwell, coming, running out of that area, going back by the dumpsters, looking through dumpsters to try to find something, and then returning upstairs. With respect to the first robbery, where again, the person did identify him in a photo lineup and also described a gun similar to the one that was found there, there is video of him not only leaving, but him returning shortly after the robbery, holding what clearly appears to be in the video, the chain that was dangling there, and he tries it on and takes it off. With respect to the hearing, as this Court made clear in Williams, there is no requirement that the Daubert hearing be held in advance of the testimony. Certainly there was ample record, both from the briefs and from the information and from the research that Judge Codall himself had done. He made clear in his opinion that he had looked at these studies. He had looked at the studies that the government referred to about error rates and was satisfied. But in addition, Williams says that you can look at the testimony that occurs during the trial prior to the admission of the expert. And as this Court pointed out, when they got to the moment of, this is the methodology I used and this is how I employed it, there was no objection other than, they just said other than the objection they'd previously raised when he walked through. And the nature of his match was spelled out through the course of his testimony. He talked about the ridges. He did point to one of the practical difficulties of this, which is you don't have a comparison microscope in the courtroom. You have photos which he acknowledged were imperfect in terms of describing what he saw. But he did describe that he requires an eight-point match or eight individual characteristics that he found and that he did so here. All that . . . I'd like to ask a question about, I'd asked this previously, and that is, I saw a report that listed the rounds that were found in the pistol retrieved from the apartment building. It was a mixture of rounds. I think there were three Smith & Wesson rounds in it. And this was a Smith & Wesson shell casing. Did that report get in or was it testimony? I know the detective testified it was a Smith & Wesson shell casing, but did the report get in about or was it testimony about what other rounds were found in the pistol that was found at the apartment building? The only testimony about rounds came from the expert who was in the interstate nexus of the shell casing that was found at the scene. But he didn't testify about the . . . and nobody testified and the report didn't get in about the other rounds? That the similar rounds were found in the gun. No, Your Honor. So for all of the foregoing reasons, the United States asks that the judgment be affirmed.  Thank you. Ms. Cassidy. I just have a couple of things. One, getting to the government's argument that there would be an error rate to make . . . I didn't understand you say that. It's the suggestion that it didn't come close to that and indeed what the error rate of the materials before the judge showed was between 1 and 1.5 percent. Yes, Your Honor. But that is just such faulty thinking. First of all, if there was anything close to 49 percent or even 10 percent or even 5 percent error rate, that would not allow a reasonable certainty standard to prevail. I mean, this is not math. The shell casings and the striations on the bullet, we seem to be lumping the two things together. They're very different identifying marks, right? Here we just have a shell casing so you have the marks when the hammer hits the firing pin and the breach. That was in the detective's testimony. Do any of the reports or anyone distinguish between the reliability of that kind of testimony and the striations from the rifling of the gun itself on the bullet that is typically the kind of evidence we see? I'm not sure, Your Honor. That's a good question. I haven't seen that in my reading of the PCAST reports. Do the error rates include both? Is that right? Well, the error rates vary from a variety of studies. Recently, the PCAST report did what, I mean, it didn't conduct it, but it referred to the only scientifically valid study that has been done. Since the NAS reports, there has been one called the AIM study that's in that PCAST report I cited in my reply brief. And they did a closed set study, which means that, I mean, an open set study, which means that there can be no gun, no match, whereas the ballistics community has been doing closed set studies so that there is a match in there somewhere, which is a vastly different kind of study. And in the only scientifically valid study, the rates were far different from all of the rates that law enforcement testing, because all of this testing has been within the ballistics community, which is a law enforcement community, which wants to, you know, has every interest in validating this. So compared to a one in over 5,000 error rate from the years of law enforcement studies, the only scientifically valid study, the AIM study, found actually an error rate of one in 66, and it could go up to one in 42. That's the sort of boundaries. The false positive rate of 0.2% in the law enforcement studies compared to the scientific studies false positive rate of over 33%. There really is no reason to believe that these previous studies validate this method. Thank you.